(No. 6882.   December 13, 1941)

HARRY VAN GILDER and MARGURIETE VAN GILDER, Respondents, v. JAMES WARFIELD, a minor, et al., Appellants.

(120 Pac. (2d) 243)

H. A. Baker, for Appellants.

Bissell & Bird, for Respondents.

BUDGE, C.J.—Action to quiet title, contested by the following heirs of Harry A. Warfield who died February 27, 1934. James aged 13 years, son of Warfield and his second wife, Nena S. Warfield, appearing through his guardian, E. E. Kearns, and as transferree of his half-brother Thomas aged 22 years, son of Warfield and his first wife, now deceased. George and Alice, aged 9 and 6 years respectively, children of Warfield's third wife,

Irene, appearing through their guardian ad litem, Irene Warfield. The widow, Irene, and a daughter, Maud, by Warfield's first wife, reached their majorities three years prior to the present action, and respondents' motion for non-suit was confessed as to them.

Early in 1929, Nena S. Warfield, then sole owner of the property here in controversy, became afflicted with a brain tumor, and was taken to a hospital at Twin Falls. March 1, 1929, pursuant to Warfield's request, C. Fred Howe was by the probate court of Blaine County duly appointed guardian of the person and estate of Nena S. Warfield, and thereafter qualified as such. Due to the serious illness of Nena S. Warfield and the nature of her ailment, it was decided that she should be taken to Mayo Brothers at Rochester. Whereupon her guardian Howe communicated with respondent Mr. Van Gilder (hereinafter referred to as 'respondent') who resides in Illinois and whose wife was Nena S. Warfield's sister. The following extract from one of a number of letters written respondent by guardian Howe reflects the unfortunate situation confronting Harry A. Warfield, his wife, Nena, and her guardian, Howe:

"Nena's expenses at the Hospital are rapidly using up all of her estate, and both on account of expense there, and the possible saving of her life, her movement from the Hospital should be made at the quickest possible moment.

"The Hospital management is somewhat urgent regarding the payment of their bill and to the first instant it is over $300.00, * * * * Dr. Alexander says if she is not to go to Mayo Bros., she should be removed from the Hospital to some private quarters and have a nurse stay with her, to reduce the present great expense. In fact the Hospital has intimated turning her out soon for debt and present lack of necessity for her to be there.

" * * * * I am enclosing a Court copy of the present law for Administrators and Guardians to follow, which same was passed by our last legislature, and by this I would be willing to issue, under sanction of the Court, Guardian's notes for the sum that you would advance for me to at once liquidate the pressing bills and give time to turn the Estate into cash.

" * * * * Now if you are desirous for the best interests for Nena's life and the saving of what is possible of her estate, remit at once to me a Bank draft for $1000.00 and I will execute to your order two notes, according to law, for like amount * * * * . This being done, I understand that Mrs. Van Gilder will meet Nena and the nurse upon arrival at Rochester and assume and pay Nena's and the nurses bills and expenses there and thereafter as long as they are kept there, and until Nena's estate may have liquidated funds to meet extended costs after paying your notes as proposed to issue.

*      *      *      *      *      *      *      *      *

"Perhaps you may not understand that I am under Bonds to the Court for $1000.00 and therefore are [am] responsible to the Court and Bondsmen to administer according to law."

Replying to the above letter respondent on May 14, 1929, wired $1000 to guardian Howe, who gave respondent two notes evidencing said loan, one for $600 due nine months after date, the other for $400 due twelve months after date, each bearing seven per cent interest.

Nena S. Warfield died en route to Rochester on May 18, 1929, and her body was returned to Ketchum for burial. May 28th, Howe filed with the probate court his account of money received and expended, which on June 10th was duly approved by the probate judge, major items being as follows:

| | |
|---|---:|
| Transportation for Mrs. Warfield and her nurse, cash used while traveling and nurse's salary | $259.55 |
| Twin Falls Hospital, May 17, 1929 | 361.20 |
| Transportation back to Ketchum | 156.10 |
| Undertaker | 120.05 |
| Attorney for estate | 25.00 |
| Balance to nurse | 25.93 |
| Total | $947.83 |

Having been duly appointed, and qualifying as, administrator of the Nena S. Warfield estate at Warfield's

request, Howe, as administrator borrowed from respondent $300 and $500 on June 10 and July 15, 1929, respectively, each loan being evidenced by a promissory note bearing seven per cent interest. Upon all four of the notes heretofore referred to was written "This note is given and accepted under the authority of Section 7688—Chapter 174 of Idaho Session Laws of 1929." Howe paid the $500 note on June 21, 1930, the others were renewed and interest paid from time to time as they became due. In borrowing the money, Howe, as guardian and administrator failed and neglected to comply with the provisions of Section 15-902, I. C. A. Respondent also failed to see that the provisions of the aforementioned statute were complied with, relying upon the representations of Howe that such would be done.

June 13, 1929, administrator Howe published notice to creditors. Respondent, when in Idaho in February, 1929, accompanied by his wife, visited his wife's sister, Nena, at the hospital in Twin Falls, at which time respondent paid certain hospital bills incurred in the care and treatment of Nena S. Warfield in the sum of $155.78, for which amount he filed a verified claim against the estate but filed no other claims. Certain doctors filed claims totalling $543.

Administrator Howe died February 6, 1935, at which time he, as guardian and administrator, had borrowed from respondent a total of $1800, in the manner as set out above, and had repaid $600 on principal and $511.12 on interest, leaving a balance unpaid of $1200. Prior to Howe's death, the probate judge had duly and regularly approved four of administrator Howe's annual accounts which reflected the borrowing of the money from respondent, expenditure thereof and purposes therefor.

March 15, 1935, one Agnes Barry was duly and regularly appointed administratrix of the Nena S. Warfield estate, and thereafter qualified as such. At the urgent request of the probate judge, that the estate be closed, and that proceedings be had to the end that the notes held by respondent be paid together with certain doctor bills heretofore mentioned, the property was reappraised and an effort was made by the administratrix to find a pur-

chaser but none could be found. Whereupon, by mutual agreement reached by the probate judge, administratrix, and attorney for the estate, a proposition was made to respondent. In substance, that if respondent would cancel his obligations against the estate, assume and pay certain doctor bills and accept the land in controversy, and a small balance in cash in the hands of the administratrix, in lieu of all indebtedness against the estate, regular proceedings would be had in the probate court for the sale of the property.

After respondent paid compromised doctor bills in the sum of $235, the property was duly and regularly advertised for sale at private sale for "cash on confirmation by the court." Respondent submitted his bid for $1150, slightly more than 90 per cent of the value of the property as reappraised, his bid further reciting "I am sole creditor of said estate by personal claims and assignments of the other creditors." Assignment of other creditors had reference to the several doctor bills assigned to respondent.

Respondent's bid was duly and regularly accepted and the property sold to him subject to confirmation by the probate court. While the notice of sale contained the recital, "Terms and conditions of sale; cash on confirmation by the court. Purchaser to pay 1936 taxes. Sale subject to confirmation by the probate court of Blaine County, Idaho," respondent made payment not in actual cash but by cancelling and delivering his notes and assigned claims to administratrix Barry.

Thereafter the administratrix made her return in which she set out the sale together with her petition for confirmation thereof, showing all proceedings had up to and including the sale and the name of the purchaser, which was filed with the probate judge, and thereafter confirmed by the probate court by its order duly entered on May 18, 1936, in which order the administratrix was directed "that proper and legal conveyance" be executed to respondent. Whereupon the administratrix executed and delivered her deed, as administratrix, to respondent.

No appeal was taken to the district court from the order of the probate court confirming the sale and no motion was

made to vacate the sale within the time limited, or at all. This appeal is taken from "that certain decree or judgment made in the above entitled cause on the 24th day of September, 1940, in favor of the plaintiffs and cross-defendants [respondents] and against the defendants and cross-complainants [appellants] and from the whole thereof."

Appellants' contentions are that the conveyance of the land to respondent by administratrix Barry was fraudulent and void in that there was a lack of compliance by the guardian and administrator Howe with the provisions of Section 15-902, supra; that the terms of the sale being for cash, the land could be sold only for cash, and payments for said land could not be made by respondent by the surrender of the notes and the assignments of the doctors' claims; that the sale was therefore without consideration and void.

It is conceded that the guardian and administrator Howe made the loans as disclosed by the statement of facts; that the money as evidenced by the notes was received and disbursed by guardian and administrator Howe as disclosed by his annual accounts; that the doctor bills were assigned to respondent upon payment of a compromised amount; that the money so borrowed and expended was for the sole benefit of the deceased Nena S. Warfield and her estate; that the principal part of the money was expended in her last illness in the payment of hospital fees, hospital treatments, medicines, physicians, nurses, railroad fare, and burial, and for the benefit of her separate estate in the payment of a mortgage and past due taxes.

It cannot be successfully contended that there was fraud, over-reaching, or pressure looking to the collection of the notes by respondent, or that an unfair price was paid for the land, or that a fair hearing of the proceedings was prevented by respondent.

The order of confirmation would be subject to impeachment only in case respondents be found guilty of fraud. In *Harkness v. Hartwick,* 49 Ida. 794, 796, 292 Pac. 592, it was held to be fundamental that a probate sale will not be set aside for fraud without allegations and proof that

the purchaser at such sale was a party to the fraud. (See also *Harkness v. Utah Power & Light Co.*, 49 Ida. 756, 760, 291 Pac. 1051; *Walker B. & T. Co. v. Steely*, 54 Ida. 591, 605, 34 Pac. 2d 56; *Hill v. Wilkinson*, 60 Ida. 243, 90 Pac. 2d 696.) For an interesting case frequently cited in support of the principle herein announced, see *Lessee of Grignon v. Astor*, 2 How. 319, 11 L. ed. 283.

This court has announced the rule that where fraud is urged as a basis for setting aside a judgment and the alleged fraud is intrinsic, and not extrinsic or collateral thereto, 'the judgment is not open to collateral attack. (*Donavan v. Miller*, 12 Ida. 600, 88 Pac. 82.) The same principle would apply in a proceeding to vacate a decree of confirmation.

The question therefore arises, what is extrinsic fraud, what is intrinsic fraud.

An act preventing fair submission of the controversy is "extrinsic fraud." (*Garrett Biblical Institute v. Minard*, 82 Kan. 338, 108 Pac. 80, 81; *Beatty v. Beatty*, 114 Okla. 5, 242 Pac. 766, 770; *Stillie v. Stillie*, 121 Kan. 591, 249 Pac. 672, 674; *Bullard v. Zimmerman*, 88 Mont. 271, 292 Pac. 730, 732; *Platnauer v. Forni*, 131 Cal. App. 393, 21 Pac. 2d 638; *Ringwalt v. Bank of America Nat. Trust & Savings Ass'n*, 3 Cal. 2d 680, 45 Pac. 2d 967, 969; *McLaughlin v. Security-First Nat. Bank of Los Angeles*, 20 Cal. App. 2d 602, 67 Pac. 2d 726, 727; *Smith v. Smith*, 180 Okla. 312, 69 Pac. 2d 392; *Calkin v. Wolcott*, 182 Okla. 278, 77 Pac. 2d 96, 101; *In re Culbertson's Estate*, 152 A. 540, 543, 301 Pa. 438; *Toledo Scale Co. v. Computing Scale Co.*, C. C. A. Ohio, 281 F. 488, 494.)

"Extrinsic fraud" which justifies a court of equity in setting aside a decree is one which prevents party claiming to be injured from having a trial or presenting all his case to court and does not apply to any matter which was actually presented and considered in judgment assailed. (*Dockery v. Central Arizona Light & Power Co.*, 45 Ariz. 434, 45 Pac. 2d 656, 663.)

"Intrinsic fraud" includes such matter as fraudulent instruments, perjured testimony, or any matter which was actually presented to and considered by the probate court in rendering the judgment assailed. In other words,

any fact considered by the probate court is "intrinsic" not "extrinsic." (*Traders & Generals Ins. Co. v. Rhodaharger,* Tex. Civ. App., 109 S. W. 2d 1119, 1123. Also, *Eaton v. Koontz,* 138 Kan. 267, 25 Pac. 2d 351; *Harvey v. Griffiths,* 133 Cal. App. 17, 23 Pac. 2d 532; *Zaremba v. Woods,* 17 Cal. App. 2d 309, 61 Pac. 2d 976; *Putnam v. Putnam,* 126 Kan. 479; 268 Pac. 797, 799; *O. A. Graybeal Co. v. Cook,* 16 Cal. App. 2d 231, 60 Pac. 2d 525; *LaSalle v. Peterson,* 220 Cal. 739, 32 Pac. 2d 612, 613; *Oregon-Washington v. Reid,* 155 Or. 602, 65 Pac. 2d 664, 667; *Carr v. Bank etc.,* 79 Pac. 2d 1096; *Minter v. Minter,* 103 Mont. 219, 62 Pac. 2d 233, 236; *Caldwell v. Taylor,* 218 Cal. 471, 23 Pac. 2d 758, 88 A. L. R. 1194; *Kasparian v. Kasparian,* 132 Cal. App. 773, 23 Pac. 2d 802; *Price v. Smith,* Tex. Civ. App., 109 S. W. 2d 1144; *Phillips Petroleum Co., v. Jenkins,* C. C. A. Ark., 91 F. 2d 183.)

Under the facts and circumstances of this case, the ommission or failure of the guardian and administrator Howe to comply with the provisions of Section 15-902, supra, was not extrinsic fraud; nor would such an omission or irregularity in the proceedings impair or invalidate the note or notes, under Section 15-902, sub-division 5; nor was the failure to pay in "cash" extrinsic fraud. These matters were before the probate court, not collateral to the proceedings therein.

In the instant case it affirmatively appears that there were no creditors other than respondent; that there was not sufficient property to pay the debts of the estate and costs of administration. The rule would seem to be well supported that only creditors, heirs and beneficiaries who are prevented from obtaining satisfaction of their claims are in a position to complain. (*In re Hemrich's Guardianship,* 187 Wash. 21, 59 Pac. 2d 748; *Brown v. Nelms,* Ark. 112 S. W. 373; *King v. Gilreath,* Ala. 45 So. 89; 24 C. J. 642.)

In *McMillan v. Boese,* Cal. 115 Pac. 2d 37, an attempt was made to collaterally attack the decree of the probate court. In the course of that opinion it is said, where a decree is valid upon its face, it is not open to collateral attack, but is open to direct attack on the ground

of extrinsic fraud. (*Eisenmayer v. Thompson,* 186 Cal. 538, 199 Pac. 798.)

As was said by Mr. Chief Justice Ailshie, in *Moyes v. Moyes,* 60 Ida. 601, 608, 94 Pac. 2d 782:

"Whether or not the probate court committed any error in the course of the proceedings or in the making of its order is beside the issue here. The real question is, did the court have jurisdiction to hear and determine the matter and to commit the error, if error was committed, in the exercise of its jurisdiction. (See *Short v. Thompson,* 56 Ida. 361, 55 Pac. 2d 163, and cases cited therein.)"

Without further reference to the above entitled case, the principles of law therein announced are sound, have application to the facts in the case at bar, and are controlling.

It is the policy of the law to uphold probate sales. (*Tatum v. Iowa Water Co.,* 166 Pac. 817, 819, 33 Cal. App. 805; *Bagley v. City of San Francisco,* 19 Cal. App. 255, 125 Pac. 931; *Montgomery v. Gilbert,* Mont. 108 Pac. 2d 616, 626; 21 Am. Jur. 753; 11 Cal. Jur. 880.)

As was said in *Lessee of Grignon v. Astor, supra:*

"Titles acquired under the proceedings of courts of competent jurisdiction, must be deemed inviolable in collateral action, or none can know what is his own; and there are no judicial sales around which greater sanctity ought to be placed, than those courts to whom the laws of the States confined full jurisdiction over the subjects."

As was said in Woerner's American Law of Administration, page 489, vol. 1, "To allow such judgment to be questioned or ignored collaterally, would be to ignore practically, and logically to destroy, the court." (Bancroft's Probate Practice, par. 71, p. 130.)

It may be stated that a final judgment or decree of a court sitting in probate is as conclusive as that of any other court of record, and is immune from collateral attack except upon jurisdictional grounds or grounds of collusion or fraud. The proper remedy in such cases is by appeal and the same rule as to immunity to collateral attack applies to probate as to other judgments and decrees.

Under the provisions of Art. 5, section 21 of the State

Constitution, and section 1-1203, I. C. A., probate proceedings have the same force and effect as to their finality as similar proceedings in courts of general jurisdiction. The rule is well settled in this jurisdiction that courts of probate are courts of general and exclusive jurisdiction in probate matters, and that their decrees and judgments are as conclusive as those of other courts of record, and entitled to the same presumptions in their favor. (*Moyes v. Moyes, supra, Short v. Thompson, supra., Knowles v. Kasiska,* 46 Ida. 379, 268 Pac. 3; *Connolly v. Probate Court,* 25 Ida. 35, 136 Pac. 205; *Clark v. Rossier,* 10 Ida. 348, 78 Pac. 358; *Lessee of Grignon, supra.*)

No appeal was taken from the order of the probate court confirming the sale, as provided for under sec. 11-401, I. C. A., as amended by Chapter 71, Session Laws of 1935, or 15-1511, I. C. A.; neither was a motion made to set aside the order of confirmation in the probate court, under the provisions of sec. 5-905, I. C. A., and since there was no extrinsic fraud, the decree of confirmation not being void on its face, was not subject to collateral attack. (See *Moyes v. Moyes, supra.,* and cases heretofore cited.)

So conceding, but not admitting, that there may have been intrinsic fraud, even so, the decree cannot be set aside. (*Cook v. Cook,* Cal. 111 Pac. 2d 322, 330; *McMillan v. Boese, supra; Farley v. Davis,* Wash. 116 Pac. 2d 263, 268; *Drum v. Aetna Casualty & Surety Co.,* Okla. 116 Pac. 2d 715.) If appellants were entitled to relief of any nature, such relief could only be afforded in the probate court by motion, or upon appeal to the district court from the probate court's decree of confirmation within the statutory period.

Judgment of the district court is affirmed and it is so ordered.

Costs to respondents.

Ailshie, J., concurs. Holden, J., concurs in the conclusion reached. Morgan, J., dissents.

GIVENS, J., concurring specially—It seems to me that,

going directly to the heart of the controversy involved herein, the ultimate, decisive question is whether the amounts paid out by the administrator and the credits allowed respondent were for expenses of the last illness of the deceased and for the necessary preservation of the estate, and therefore fall within section 15-1127 I. C. A. as not requiring the filing of claims therefor, as construed in *Hubbard v. Ball,* 59 Ida. 78, 81 Pac. (2d) 73.

Though the amount was not as large and the period of time over which the expenses had been incurred was not so extensive, and was not, as herein, in part loans, and though I there dissented, the majority there held, and such is evidently now the established law in this jurisdiction (*Walling v. Bown,* 9 Ida. 740, 76 Pac. 318; *International Mtg. Bk. v. Barghoorn,* 43 Ida. 24, 248 Pac. 868; *In re Speer,* 53 Ida. 293, 23 Pac. (2d) 239), that such expenses fell within section 15-1127 and did not require the filing of a claim therefor, and stated that that section should be given a liberal construction. Applying that holding and such construction and that of similar cases (21 Am. Jur., Executors and Administrators, sections 350 and 397, pages 580 and 609; Vol. 3, Bancroft's Probate Practice, section 973, page 1649, and sections 780-1, pages 1391-3; *In re Hansen's Estate,* 55 Utah 23, 184 Pac. 197) clearly justifies the conclusion that these expenditures were legitimately approved by the probate court as expenses of the last illness though no claims had been filed therefor.

Although I have not found any cases directly passing upon such allowance where the expenditures were by a guardian, it does not seem to me that whether the expenses were paid through the medium of a guardian or directly through, to, or on account of the deceased would make any difference, the controlling point being whether they were actually expended and were reasonably necessary in connection with the last illness, and this, as stated by the Chief Justice, the record clearly proves. I therefore concur in the conclusion. (*McLean v. Breen,* (Tex.) 219 S. W. 1089, 9. A. L. R. 459; *Fleming v. First Nat. Bank,* (La.) 141 So. 793; *Proto v. Chenoweth,* 40 Ariz. 312, 11

Pac. (2d) 950; *Long v. Northrup,* 225 Iowa 132, 279 N. W. 104, 116 A. L. R. 1475.)

The statutes (sections 15-1822-3 I. C. A.) would seem to justify if not require such expenditures.

It is urged that it is too late to now question the allowance of these claims, since an order of confirmation was entered and no appeal taken. As against this, various grounds of imputed extrinsic fraud are asserted. It does not seem to me there is any extrinsic fraud, and while I am not of the opinion that it is too late, in this quiet title suit brought by a creditor as purchaser by application of his claims on the purchase price of the land of the estate, for the heirs to question these payments, it does seem to me that the situation may be viewed differently than if it were on appeal in the first instance directly from any of the probate proceedings.

I reserve, however, the point as to when, to what extent, and under what circumstances, not the deceased wife's estate, but the husband, is exclusively, jointly, or at all liable for the expenses of the last illness of and funeral for his deceased wife. Such reservation is for two reasons: first, the point was not presented herein; and second, though only indirectly adverted to and meagerly inferentially appearing, it would seem that recourse against the husband would have been totally unavailing.

In connection with such reservation I notice that our legislature, though adopting from California sections 173 and 176 of the California Code of Procedure, being sections 31-915 and 31-916, I. C. A., did not see fit to adopt section 174 of the civil code, under which California has held that the husband alone is liable for such expenses. (*In re Weringer's Estate,* 100 Calif. 345, 34 Pac. 825; *Medros v. Kohn,* 68 Calif., A. 367, 229 Pac. 873; *Riley v. Robbins,* (Calif.) 25 Pac. (2d) 539.) See also *In re Wilson's Estate,* 160 Okla. 23, 15 Pac. (2d) 825; Vol. 3, Bancroft's Probate Practice, section 1039, page 1742; *Palmer v. Turner,* 241 Ky. 322, 43 S. W. (2d) 1017; Vol. 3, Bancroft's Probate Practice, section 782, page 1393; 27 Am. Jur., Husband and Wife, sections 456-8, pages 56-7; 21 Am. Jur., Executors and Administrators, sections 330 and 334, pages 568 and 571; 30 C. J., Hus-

band and Wife, section 156, page 606 et seq.; *Barnes v. Starr*, 144 Md. 218, 124 Atl. 922.

What is stated to be the majority rule is set forth in 31 A. L. R. 1499, the contrary or minority rule being referred to at page 1506. Attention is also called to *Edminston v. Smith*, 13 Ida. 645, 92 Pac. 842, and *McHan v. McHan*, 59 Ida. 496, 84 Pac. (2d) 984.